Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| APEX BANK | | APELACIÓN |
|---|---|---|
| Apelada | | Procedente del Tribunal de Primera Instancia, Sala de SAN JUAN |
| v. | TA2025AP00088 | Caso Núm.: K CD2016-2329 |
| JAIME MAYOL BIANCHI, MARIE ZAYAS BURGOS t/c/p MARIE ZAYAS Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS | | Sobre: Ejecución de Hipoteca |
| Apelante | | |

Panel integrado por su presidente el Juez Rodríguez Casillas, el Juez Adames Soto, la Jueza Mateu Meléndez y el Juez Marrero Guerrero.

Mateu Meléndez, Jueza Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 15 de septiembre de 2025.

El 7 de julio de 2025, el Sr. Jaime Luis Mayol Bianchi, la Sra. María de los Ángeles Zayas Burgos t/c/c Marie Zayas y la Sociedad Legal de Bienes Gananciales compuesta por ambos, (en adelante, matrimonio Mayol-Zayas o apelantes), presentaron ante este Tribunal de Apelaciones un recurso de *Apelación.* Mediante este nos solicitan que revoquemos la *Sentencia Enmendada* emitida el 8 de abril de 2025, notificada el 16, por el Tribunal de Primera Instancia (en adelante, TPI), Sala Superior de San Juan. Por virtud del referido dictamen, el foro primario concedió la solicitud de sentencia sumaria promovida por Apex Bank (en adelante, Apex o parte apelada) y, como resultado, declaró Ha Lugar la demanda en cobro de dinero y ejecución de hipoteca incoada contra los apelantes.

Con el beneficio de la parte apelada y conforme a la evidencia presentada, por las razones que más adelante explicamos, **confirmamos** el dictamen apelado.

**-I-**

A continuación, exponemos el trámite procesal más importante relacionado a la controversia de epígrafe, según recopilamos de los documentos que conforman el Apéndice del recurso.

El 28 de noviembre de 2016, Oriental Bank (en adelante, Oriental) presentó la demanda de cobro de dinero y ejecución de hipoteca de epígrafe contra el matrimonio Mayol-Zayas. En resumen, alegó que el 15 de agosto de 2007, los apelantes suscribieron un pagaré a favor de Eurobank, o a su orden, por la suma de $1,140,000.00 con intereses al 7.25% anual. Además, se adujo que el matrimonio Mayol-Zayas suscribió una escritura para constituir una hipoteca en garantía de dicho pagaré. Como tenedor por endoso del pagaré, Oriental reclamó la suma de $1,090,489.68 de principal con intereses según pactado, desde el 1ro de mayo de 2016, entre otras partidas.

El 26 de abril de 2017, el matrimonio Mayol-Zayas contestó la demanda. Además, interpuso una reconvención. Luego de varios trámites que son innecesarios discutir, con fecha del 10 de octubre de 2018, Oriental presentó *Moción de Sentencia Sumaria*. Posteriormente, el 24 de junio de 2019, solicitó se adjudicara este escrito. Al oponerse a ello, los apelantes indicaron que el caso se encontraba activo bajo "*loss mitigation*". El 9 de septiembre de 2019, el TPI dictó sentencia mediante la cual sumariamente declaró Ha Lugar la demanda. El matrimonio Mayol-Zayas solicitó oportunamente la reconsideración de este dictamen. Esta fue denegada el 31 de octubre de 2019.

Insatisfechos aun, el 26 de noviembre de 2019, el matrimonio Mayol-Zayas presentó la apelación KLAN201901331.[1] El 21 de febrero de 2020, este

---

[1] En dicha ocasión, los apelantes señalaron la comisión de cuatro (4) errores. En estos, le imputaron equivocarse al declarar con lugar la sentencia sumaria solicitada por la apelada: basado en una deficiente demanda de la cual, de su propia faz, surgen serias interrogantes respecto al monto de la supuesta deuda, su cómputo y documentación en apoyo al reclamo; en una crasa violación al debido proceso de ley, sin haberse dado inicio al descubrimiento de prueba y sin haberse cumplido siquiera con el proceso inicial para el

foro emitió *Sentencia* mediante la que revocó la Sentencia apelada. En dicha ocasión, se resolvió que Oriental no acreditó adecuadamente ante el foro de instancia que el proceso de mitigación de pérdidas ante el banco había finalizado. Así pues, se finiquitó que el TPI no tenía ante sí parámetros suficientes como para concluir que el trámite de mitigación de pérdidas ante Oriental había concluido. Ante tal hecho, se dejó sin efecto la sentencia y se devolvió el caso al TPI para que se pudiera precisar dónde se encontraba el proceso de "*loss mitigation*". Se estableció que de este no haber culminado, deberían paralizarse los procedimientos. Por su parte, y en caso de que así hubiera ocurrido, le ordenó al foro primario a evaluar la solicitud de sentencia sumaria, no sin antes atender los planteamientos de los apelantes sobre la necesidad de descubrimiento de prueba.

Oriental eventualmente fue sustituido por Apex como parte demandante.[2] Luego de varios trámites procesales, en el mes de abril de 2023, Apex sometió una *Moción en Cumplimiento de Orden* donde arguyó haber culminado con el proceso de "*loss mitigation*". Además, incluyó tres misivas denegadas, con distintas alternativas para las que fueron evaluados los apelantes. El matrimonio Mayol-Zayas replicó este escrito. Así las cosas, el 8 de febrero de 2024, la parte apelada presentó una *Moción de Sentencia Sumaria* donde estableció que no existía controversia sobre los siguientes hechos esenciales y pertinentes:

1. El día 15 de agosto de 2007, Jaime Luis Mayol Bianchi, María de los Ángeles Zayas Burgos t/c/c Marie Zayas y la sociedad legal de bienes gananciales compuesta por ambos otorgó ante el notario Carlos E. Umpierre Shuck, testimonio número 1136 un pagaré a favor de Eurobank o a su orden, por la suma principal de $1,140,000.00 más intereses desde esa fecha hasta el pago total del principal a razón de 7.250% de interés anual sobre el balance adeudado ("el pagare o instrumento"). Además, el pagaré provee para pagar recargos por demora equivalentes a

---

manejo del caso; en violación de los derechos de los deudores protegidos por la "Ley para mediación compulsoria" y preservación de tu Hogar en los procesos de ejecuciones de hipotecas de una vivienda principal; y en una grave violación de los derechos de los apelantes bajo la Ley Federal de "Loss Mitigation", 12 C.F.R 1024.

[2] Al menos así alegó Apex en la solicitud de sentencia sumaria que sometió en el caso. Según allí manifestado, esto ocurrió mediante Orden del 10 de febrero de 2020. Hacemos la salvedad que la referida orden no acompañó tal solicitud. Tampoco ha sido examinada por esta curia.

5.000% de la suma de aquellos pagos con atrasos en exceso de 15 días calendarios de la fecha de vencimiento; un 10% de la suma original del principal del pagaré para cubrir sumas por concepto de costas, gastos y honorario de abogados en caso de reclamación judicial. *Refiérase al pagaré que se une como ANEJO I y al párrafo (3) de la declaración jurada que se une como ANEJO II y a la sección (27) de la página (33) de la escritura de hipoteca que se acompaña como ANEJO III.*

2. Para garantizar el pago de dicho pagaré se constituyó una hipoteca voluntaria mediante la escritura número 170 otorgada el día 15 de agosto de 2007 ante el Notario Carlos E. Umpierre Schuck ("la escritura de hipoteca"). *Refiérase a la escritura de hipoteca que se una como ANEJO III y al párrafo (3) de la declaración jurada que se une como ANEJO II.*

3. La escritura de hipoteca grava el bien inmueble que se describe a continuación ("la finca o propiedad"). *Véase escritura de la hipoteca la página (35) que se une como Anejo III y la certificación registral que se une como ANEJO IV.*

> RÚSTICA: Parcela de terreno identificado como lote número 3, radicado en el barrio Caimito Alto del Municipio de Rio Piedras (San Juan), Puerto Rico, con una cabida de dos cuerdas y mil doscientos treinta y nueve diezmilésimas de otra, equivalentes a ochenta y tres áreas, cuarenta y siete centiáreas y diez mil ochocientos setenta y dos miliáreas. En lindes por el NORTE, con Gerónimo Guzmán; por el ESTE, con Camino Concepción; por el SUR, con remanente finca principal; y por el OESTE, con remanente finca principal. Gravada con servidumbre de un metro y medio a lo largo de su colindancia con Camino Concepción. Grava con servidumbre de paso de cinco metros a lo largo de colindancia Sur y Oeste para camino de acceso a lotes cuatro y cinco.

4. La finca o propiedad antes descrita consta inscrita al folio 11 del tomo 412 de Rio Piedras Sur, Registro de la Propiedad de San Juan, Sección Cuarta, finca número 13616. *Refiérase a la certificación registral que se une como ANEJO IV.*

5. La hipoteca fue constituida para garantizar (a) el repago de la deuda evidenciada por el pagaré (b) una suma equivalente al 10% de la suma principal del pagaré para cubrir cualquier otro adelanto que se haga en virtud de la escritura de hipoteca (c) una suma equivalente al 10% de la suma principal del pagaré para cubrir intereses en adición a los garantizados por ley y (d) 10% de la suma principal del pagaré para cubrir costas, gastos y honorarios de abogado. *Véase sección (27) a la página (33) de la escritura de la hipoteca que se une como ANEJO III.*

6. El pagaré y la escritura fueron modificados mediante la escritura 251 otorgada el 30 de julio de 2015 ante el Notario Juan Martínez Romero en cuanto a los siguientes extremos: 1) aumentar el balance de principal a $1,476,337.82; 2) Comenzando el 1 de septiembre de 2015 hasta el 1 de agosto de 2020 devengará 6% de interés anual sobre el balance insoluto de principal; 3) comenzando el 1 de septiembre de 2020 devengará intereses razón de 7.25% anual sobre el balance insoluto de principal hasta su fecha de vencimiento; 4) la nueva fecha de vencimiento es 1 de agosto de 2055, fecha en la cual la parte demandada acordó pagar $380,796.90 por concepto de

intereses, recargos y otros cargos. *Véase escritura de modificación de hipoteca que se une como ANEJO V.*

7. La parte demandante es la parte con derecho a exigir el cumplimiento del instrumento. *Véase el pagaré que se une como ANEJO I del cual surge un endoso en blanco. Refiérase al párrafo (9) de la declaración jurada que se une como ANEJO II.*

8. La parte demandada ha dejado de pagar las mensualidades vencidas desde el día 1 de junio de 2016 y en su consecuencia ha incurrido en el incumplimiento de su obligación de pagar en plazos mensuales el principal y los intereses según acordados. *Refiérase al párrafo (3) del pagaré que se une como ANEJO I de donde surge la obligación de hacer pagos mensuales y al párrafo (8) de la declaración jurada que se une como ANEJO II de donde surge el incumplimiento.*

9. La demandada de epígrafe adeuda al demandante las siguientes sumas: $1,090,489.68 en principal, más intereses al tipo pactado de 7.25% anual desde el 1 de junio de 2016 hasta el pago total de la deuda; cargos por demora equivalentes al 5.000% de todos aquellos pagos con atrasos en exceso de 15 días calendarios de la fecha de vencimiento hasta el total y completo repago de la deuda; las cantidades debidas de contribuciones e impuestos, primas de seguro contra riesgo y seguro de hipoteca hasta su completo pago, Además, adeuda un pago diferido de $380,796.90; además adeudan el 10% del principal del pagaré hipotecario para el pago de costas, gastos y honorarios de abogado como suma pactada a dichos efectos en el pagaré. *Refiérase al párrafo (8) de la declaración jurada que se une como ANEJO II, la sección (27) a la página (33) de la escritura de hipoteca que se une como ANEJO III y escritura de modificación de hipoteca a la página (5) que se une como ANEJO V.*

10. Apex ha realizado gestiones para obtener el pago de las sumas reclamadas resultando tales gestiones infructuosas por lo cual ha declarado vencida la totalidad de la deuda. *Refiérase al párrafo (12) de la declaración jurada que se une como Anejo II.*

11. La parte demandada no se encuentra en el servicio militar activo. *Refiérase a la certificación del Departamento de la Defensa que se une como ANEJO V.*

El matrimonio Mayol-Zayas se opuso a la sentencia sumaria y, a tales efectos, adujo que los siguientes asuntos litigiosos estaban en controversia:

1. Si el extinto Eurobank y/o sus oficiales sobrevalorizaron el préstamo objeto de la presente reclamación, e incurrieron en negligencia crasa en el manejo de las facilidades crediticias a su cargo al inducir a los comparecientes a tomar un préstamo que no podían repagar.

2. Si el cierre de Eurobank en el 2010 constituye un hecho que no fue contemplado por las partes al momento de contratar, y por ende se trata de un cambio extraordinario e imprevisible que amerita la aplicación de la doctrina Rebus Sic Stantibus.

3. Si posterior a la fecha en que se suscribió el préstamo hipotecario y se sobre valorizó la propiedad, el inmueble ha advenido underwater, entiéndase que ha disminuido sustancialmente de valor. Lo cual constituye un hecho que no

fue contemplado por las partes al momento de contratar, y por ende se trata de un cambio extraordinario e imprevisible que amerita la aplicación de la doctrina Rebus Sic Stantibus.

4. Si la parte demandante se está enriqueciendo injustamente, a sabiendas de que Oriental Bank compró la cartera de préstamos del FDIC a un 80% de descuento y una propiedad sobrevalorizada, y ahora pretende recobrar más de lo debido.

5. Si Apex Bank incumplió con la Ley 184-2012 y el requisito jurisdiccional de mediación compulsoria de buena fe, cuando no orientó a los comparecientes sobre las alternativas disponibles en el mercado para evitar la ejecución del inmueble objeto de este litigio, máxime cuando Apex Bank no tiene oficinas ni oficiales bancarios en P.R.

6. Si la parte demandante, Apex Bank, incumplió con el proceso de "loss mitigation", conforme a las leyes y reglamentos federales y estatales.

7. Si la deuda se encuentra vencida, es líquida y exigible. Para reputar una deuda como líquida, la cuenta debe haber sido aceptada como correcta por el deudor.

8. Si Apex Bank es el acreedor hipotecario poseedor del pagaré hipotecario original y que, por lo tanto, tiene legitimación activa para continuar la presente acción. El Tribunal debe evaluar el pagaré y permitir la inspección de este por el demandado y el expediente original del banco, lo cual todavía no ha ocurrido. Al existir hechos materiales en controversia no procede disponer del presenta caso por la vía sumaria. En cambio, procede ventilar el caso de epígrafe en todos sus méritos en una vista evidenciaría.

El 2 de diciembre de 2024, el foro recurrido emitió *Sentencia* a favor de la parte apelada mediante la cual ordenó el pago de lo adeudado. Oportunamente, el 19 de diciembre de 2025, los apelantes presentaron una *Moción de Reconsideración*. En este escrito, el matrimonio Mayol-Zayas sostuvo que el foro primario no ostentaba jurisdicción para atender el caso conforme a la Ley Núm. 184- 2012.[3] Además, se reafirmó en que existían hechos materiales esenciales en controversia que impedían la adjudicación de la sentencia sumaria solicitada.

El 8 de abril de 2025, notificada el 16, el foro primario emitió *Sentencia Enmendada*. En esta, el TPI mantuvo los planteamientos anteriormente esbozados en su dictamen del 2 de diciembre de 2024. También ordenó la

---

[3] Ley Núm. 184 de 17 de agosto de 2012, según enmendada, conocida como Ley para Mediación Compulsoria y Preservación de tu Hogar en los Procesos de Ejecuciones de Hipotecas de una Vivienda Principal. 32 LPRA sec. 2882, et seq. (en adelante, Ley 184-2012).

desestimación con perjuicio de la reconvención sometida en el caso por el matrimonio Mayol-Zayas. El 23 de mayo de 2025, los apelantes solicitaron la reconsideración de esta *Sentencia Enmendada*, más fue denegada mediante *Resolución* emitida el 2 de junio de 2025 y notificada el 5 del mismo mes y año.

Inconformes aún, el matrimonio Mayol-Zayas sometió el recurso de epígrafe y señaló la comisión de los siguientes errores:

> Erró el TPI al declarar con lugar la solicitud de sentencia sumaria de la parte demandante cuando existían hechos materiales en controversia que ameritaban el señalamiento de una vista evidenciaria, entre ellos que Apex Bank no es tenedor de buena fe del pagaré hipotecario de los apelantes.

> Erró el TPI al denegar la aplicación del retracto de crédito litigioso.

> Erró el TPI al desestimar la reconvención de los apelantes y declarar finalizado el descubrimiento de prueba en clara violación del debido proceso de ley que les asiste.

> Erró el TPI al dar por cumplido el requisito jurisdiccional de la Ley 184-2012, sin haberse celebrado un acto de mediación con el nuevo acreedor, en violación a los derechos de los apelantes al amparo de la "Ley de Mediación Compulsoria y Preservación de tu Hogar en los Procesos de Ejecuciones de Hipotecas de una Vivienda Principal".

> Erró el TPI al considerar cumplida la obligación del acreedor de ofrecer un proceso de mitigación de pérdidas conforme a la normativa federal aplicable, en clara violación de los derechos de los apelantes.

Atendido el recurso, el 10 de julio de 2025, emitimos una *Resolución* concediéndole a la parte apelada el término dispuesto por el Reglamento de este Tribunal de Apelaciones para que presentara su oposición al recurso. El l6 de agosto de 2025, Apex presentó el *Alegato en Oposición a Apelación*. Allí, planteó que actuó correctamente el foro inferior al dictar sentencia sumaria y desestimar la reconvención instada por los apelantes. En primer lugar, alegó tener jurisdicción en el caso de epígrafe dado que "el pagaré objeto de la presente acción contiene un endoso en blanco por lo que basta demostrar su posesión para establecer legitimidad".

En segundo lugar, expone que no le asiste razón a los apelantes para que se declare con lugar la reconvención puesto que esta dejó de exponer

una reclamación que justificara la concesión de un remedio. Además, adujo que el foro primario le concedió a las partes hasta el 9 de enero de 2024 para culminar el descubrimiento de prueba. Por ello, el 12 de marzo de 2024, determinó no ha lugar la *Moción en Solicitud de Orden Para Compeler Contestaciones* por haberse presentado tardíamente y luego de vencido el término para solicitud de prórroga del descubrimiento de prueba.

Por su parte, estableció que el foro revisor carece de jurisdicción para atender los errores planteados por los apelantes respecto a la aplicación de retracto de crédito litigioso y para la celebración de un nuevo acto de mediación con el nuevo acreedor. Sobre esto argumentó que los apelantes agotaron los mecanismos de revisión disponibles en derecho por existir una sentencia final y firme. De igual forma, expuso que el proceso de mitigación de pérdidas culminó conforme a las disposiciones federales.

Con el beneficio de ambas partes, damos por sometido el asunto y procedemos a resolver.

-II-

*A.*

El mecanismo procesal de la sentencia sumaria dispuesto en la Regla 36 de Procedimiento Civil, 32 LPRA, Ap. V., R. 36, permite resolver los asuntos de aquellos litigios que no presentan controversias genuinas de hechos materiales y que, por consiguiente, no ameritan la celebración de un juicio. Cooperativa de Seguros Múltiples de Puerto Rico y Popular Auto, LLC v. Estado Libre Asociado de Puerto Rico, 2025 TSPR 78, pág. 5, 215 DPR ___, al citar a Cruz, López v. Casa Bella y otros, 213 DPR 980, 993 (2024). Así pues, conforme la discutida regla, procede dictar sentencia sumaria si de las alegaciones, deposiciones y admisiones ofrecidas, más las declaraciones juradas y cualquier otra evidencia presentada se acredita la inexistencia de una controversia real y sustancial sobre algún hecho esencial y material. Deberá, también, justificarse por el derecho aplicable.

*Id*., al mencionar a <u>Oriental Bank v. Caballero García</u>, 212 DPR 671, 679 (2023).

Por otro lado, la parte que se oponga a la moción de sentencia sumaria, deberá así hacerlo dentro del término de veinte (20) días desde su notificación y en cumplimiento con los requisitos de ley. Así pues, deberá efectuar una exposición breve de las alegaciones, los asuntos litigiosos o en controversia. También, deberá hacer referencia a los párrafos enumerados por la parte promovente que entiende están en controversia y para cada uno, detallar la evidencia admisible que sostiene su impugnación. Véase, Regla 36.3(b) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(b); <u>Cruz Vélez v. CEE y otros</u>, 206 DPR 694, 718 (2021); y <u>SLG Zapata-Rivera v. J.F. Montalvo</u>, 189 DPR 414, 432 (2013). Las meras afirmaciones no bastan. <u>Meléndez González et al. v. M. Cuebas</u>, 193 DPR 100, 136 (2015). Esto es así, ya que cualquier duda no es suficiente para derrotar una moción de sentencia sumaria, sino que tiene que ser una que permita concluir la existencia de una controversia real y sustancial sobre hechos relevantes y pertinentes. <u>Abrams Rivera v. E.L.A.</u>, 178 DPR 914, 932 (2010). No obstante, el no presentarse oposición a una moción de sentencia sumaria no impide que el tribunal falle en contra del promovente de esta ya que esta "puede dictarse a favor o en contra del promovente, según proceda en derecho.". <u>Audiovisual Lang. v. Sist. Est. Natal Hnos.</u>, 144 DPR 563, 575 (1997).

Así, al evaluar los méritos de una solicitud de sentencia sumaria un tribunal podrá dictar sentencia sumaria si de los documentos sometidos ante su consideración surge que no existe controversia real sustancial en cuanto a ningún hecho material y solo restaría por resolver una controversia estricta de derecho. Regla 36.3(e) de Procedimiento Civil, 32 LPRA Ap. V R 36.3(e). Por el contrario, no procederá una moción de sentencia sumaria cuando (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han

sido refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derecho, no proceda. Cruz Velez v. CEE y otros; *supra.*

En cuanto a la revisión judicial de una determinación sobre sentencia sumaria, es meritorio señalar que los foros apelativos nos encontramos en la misma posición que el foro primario. Por ello, debemos regirnos por la Regla 36 de Procedimiento Civil y aplicar los criterios de esta. No obstante, no podemos tomar en consideración evidencia que las partes no presentaron ante el TPI. Tampoco podemos adjudicar los hechos materiales en controversia, por ser una tarea que le compete al foro de instancia luego de celebrarse un juicio. Meléndez González et al. v. M. Cuebas, *supra,* pág. 118.

*B.*

Los instrumentos negociables y las transacciones comerciales en Puerto Rico se rigen por las disposiciones de la Ley Número 208 del 17 de agosto de 1995, según enmendada, 19 LPRA secs. 401 a 2207, mejor conocida como la Ley de Transacciones Comerciales (en adelante Ley 208-1995). Conforme a la sección 2-104(a) de la Ley 208, un "instrumento negociable" es:

> una promesa o una orden incondicional de pago de una cantidad específica de dinero… si el mismo:
>
> (1) Es pagadero al portador o a la orden al momento de su emisión o cuando primero adviene a la posesión de un tenedor;
>
> (2) es pagadero a la presentación o en una fecha específica; y
>
> (3) no especifica otro compromiso o instrucción por parte de la persona que promete u ordena el pago que no sea el pago del dinero.[4]

La referida ley dispone lo siguiente sobre la cesión de un instrumento negociable:

> [...]

---

[4] 19 LPRA sec. 504(a).

(c) A menos que se acuerde otra cosa, si se cede un instrumento por valor y el cesionario no se convierte en un tenedor por la falta de endoso del cedente, el cesionario tiene el derecho de exigir específicamente el endoso incondicional del instrumento por el cedente, pero la negociación del instrumento no ocurrirá hasta tanto el endoso se haya realizado.

El "tenedor" de un instrumento negociable se define en la sección 1-201, inciso (20), de la Ley 208-1995 como, "la persona en posesión del mismo si el instrumento es pagadero al portador o, en el caso de un instrumento pagadero a una persona identificada, si la persona identificada está en posesión del mismo".[5] Por su parte, la sección 2-204 del aludido estatuto define lo que es un endoso de la siguiente manera:

[s]ignifica una firma, que no sea la de un signatario como firmante, o aceptante, que por sí sola o acompañada de otras palabras se añade en un instrumento con el propósito de: (1) negociar el instrumento, (2) restringir el pago del instrumento, o (3) incurrir en la responsabilidad del endosante respecto al instrumento, pero independientemente de la intención del signatario, una firma y las palabras que la acompañen es un endoso a menos que las palabras que acompañen la firma, los términos del instrumento, el lugar donde está la firma u otras circunstancias no ambiguas indiquen que la firma fue puesta con un propósito distinto al de un endoso. 19 LPRA sec. 554(a).

Se considera un endoso especial cuando, "el tenedor del instrumento hace un endoso, sea este pagadero a una persona identificada o al portador; y el endoso identifica una persona a quien será pagadero el instrumento." Cuando haya un endoso especial, el instrumento solamente podrá negociarse mediante el endoso de la persona a favor de quien se hizo el endoso especial. *Id*. Por su parte, si el tenedor de un instrumento hace un endoso y no es un endoso especial, el mismo es, "un endoso en blanco". Cuando está endosado en blanco, un instrumento se convierte en pagadero al portador y solamente puede negociarse mediante la cesión de su posesión, hasta que sea endosado especialmente. El tenedor puede convertir el endoso en blanco, que consiste en una firma solamente, en un

---

[5] 19 LPRA sec. 451.

endoso especial escribiendo, encima de la firma del endosante, palabras que identifiquen a la persona a quien el instrumento se hace pagadero".[6]

Por otro lado, la cesión de un instrumento surge cuando se entrega por una persona que no es su emisor con el fin de darle a quien lo recibe el derecho de exigir el cumplimiento del instrumento. Independientemente de que sea o no una negociación, la cesión le confiere al cesionario cualquier derecho del cedente a exigir el cumplimiento del instrumento. Ello incluye cualquier derecho que tuviese como tenedor de buena fe. Sin embargo, el cesionario no podrá adquirir los derechos de un tenedor de buena fe por una cesión directa o indirecta de un tenedor de buena fe si el cesionario participó de fraude o ilegalidad que afectó el instrumento. Salvo pacto en contrario, si se cede un instrumento por valor y el cesionario no se convierte en un tenedor por falta de endoso del cedente, el cesionario tiene derecho a exigir específicamente el endoso incondicional del instrumento por el cedente, no obstante, la negociación del instrumento no ocurrirá hasta tanto el endoso se haya realizado.[7]

Cuando una persona o entidad paga un instrumento negociable a través de un endoso no autorizado o falso, asume los riesgos que pudiera conllevar esta acción. St. Paul Fire & Marine v. Caguas Fed. Savs., 121 DPR 761, 768 (1988). En manos del tenedor de buena fe el instrumento adquiere su máximo valor ya que el tenedor toma el instrumento libre de casi todas las defensas que las partes anteriores puedan oponer al cobro del instrumento. Miguel R. Garay Aubán, Derecho Cambiario, Ed. Revista de Derecho Puertorriqueño, (1999), a las págs. 189-190.

*C.*

El retracto de crédito litigioso es la figura jurídica que permite a un deudor extinguir una obligación pagando el precio que el cesionario de su

---

[6] 19 LPRA sec. 555.
[7] 19 LPRA sec. 553.

crédito pagó por este. <u>DLJ Mortgage v. SLG Santiago-Ortiz</u>, 202 DPR 950, 958-959 (2019) al citar al Art. 1425 del Código Civil de Puerto Rico de 1930,[8] 31 LPRA sec. 3950. En lo concerniente, el texto del citado Artículo lee de la siguiente manera:

> Vendiéndose un crédito litigioso, el deudor tendrá derecho a extinguirlo, reembolsando al cesionario el precio que pagó, las costas que se le hubiesen ocasionado y los intereses del precio desde el día en que éste fue satisfecho.
>
> Se tendrá por litigioso un crédito desde que se conteste a la demanda relativo al mismo.
>
> **El deudor podrá usar de su derecho dentro de nueve (9) días, contados desde que el cesionario le reclame el pago**.

(Énfasis nuestro.)

Para que pueda invocarse la transcrita disposición, se quiere la existencia de un crédito que se encuentre en litigio y, que este crédito haya sido cedido. Presente estas condiciones, nace el derecho a exigir su retracto, para lo que el deudor tiene nueve días, desde que el cesionario le reclama el pago. <u>DLJ Mortgage v. SLG Santiago-Ortiz</u>, *supra,* al citar a J.L. Navarro Pérez, *El retracto de créditos litigiosos*, Granada, Ed. Comares, 1989, pág. 89; G. García Cantero, en M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Edersa, 1980, T. XIX, pág. 701.

En lo pertinente al caso que nos ocupa, es menester señalar que nuestro Tribunal Supremo ha tenido la oportunidad de resolver si procede el ejercicio de la figura del retracto de crédito litigioso sobre la cesión de un pagaré hipotecario. En cuanto a ello, en <u>DLJ Mortgage v. SLG Santiago-Ortiz</u>, *supra*, determinó que la Ley de Transacciones Comerciales, Ley Núm. 208-1995, según enmendada, 19 LPRA sec. 401 *et seq.* (Ley de Transacciones Comerciales), desplazó las disposiciones del Código Civil referentes a la figura del crédito litigioso, haciéndolas inaplicables a las transferencias de

---

[8] El citado Código Civil fue derogado mediante la aprobación de la Ley 55-2020, mediante la cual se instituyó el nuevo Código Civil de Puerto Rico de 2020. No obstante, a los hechos particulares del presente caso le es de aplicación el anterior Código Civil de 1930, pues era aquel vigente al momento de los contratos y las obligaciones contraídas por las partes del caso de epígrafe. Por consiguiente, las disposiciones citadas y aplicadas serán las de este último.

instrumentos negociables otorgadas a su amparo. Por tanto, la figura del retracto de crédito litigioso no aplica en los casos de cesión o venta de un pagaré hipotecario. DLJ Mortgage v. SLG Santiago-Ortiz, *supra*, pág. 968.

*D.*

El Art. 1157 (3) del Código Civil de 1930,[9] establece que las obligaciones pueden modificarse, entre otras maneras, mediante la subrogación de un tercero en los derechos del acreedor. "Este tipo de subrogación constituye una novación modificativa subjetiva de la parte activa que no extingue la obligación original, sino que la preserva con acreedor nuevo". Integrand Assurance v. CODECO et al., 185 DPR 146, 161 (2012).

El Tribunal Supremo ha explicado que "[l]a subrogación puede operar por virtud de una ley o como producto de un contrato. A la primera se le conoce como subrogación legal y a la segunda como subrogación convencional. Id. En esta última, "el acreedor y el tercero acuerdan la transmisión de la titularidad del crédito". CSMPR v. Carlo Marrero et als., 182 DPR 411, 419 (2011).

Así, la subrogación en este contexto transfiere al subrogado los créditos con los derechos a él anexos. Id., a la pág. 420. El efecto principal de la subrogación es que, "el nuevo acreedor se coloca en la 'misma situación jurídica que se encontraba el acreedor respecto al deudor'". Id., a la pág. 419. (Bastardillas en el original, énfasis nuestro y cita suprimida). Además, adquiere las mismas limitaciones, pues nadie puede adquirir, mediante la subrogación, derechos contra el deudor que el acreedor no ostentaba. Id., a la pág. 421.

*E.*

La doctrina de cosa juzgada que decreta el Art. 1204 del Código Civil de Puerto Rico del 1930, 31 LPRA sec. 3343, impide que, emitida una

---

[9] 31 LPRA sec. 3241.

sentencia en un pleito anterior, las mismas partes litiguen otra vez en un posterior litigio las mismas causas de acción y cosas, las controversias ya litigadas y adjudicadas y aquellas que pudieron haberse litigado. Fonseca et al. v. Hosp. HIMA, 184 DPR 281, 294 (2012); Mun. de San Juan v. Bosque Real S.E., 158 DPR 743, 769 (2003). Conforme el citado artículo, para que la presunción de cosa juzgada surta efecto en otro juicio se requiere que entre el caso resuelto por sentencia y aquel en el que se invoca, concurra la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron. Beniquez et al. v. Vargas et al., 184 DPR 210, 221 (2012). Cuando la doctrina de cosa juzgada alude a la identidad entre las cosas, se refiere al "objeto o materia sobre la cual se ejercita la acción". Lausell Marxuach v. Díaz de Yañez, 103 DPR 533, 535 (1975). Esto significa que el segundo pleito se refiere al mismo asunto del que versó el primer pleito, aunque las cosas se hayan disminuido o alterado. Presidential v. Transcaribe, 186 DPR 263, 274 (2012). Para determinar si existe o no identidad de cosas, debemos cuestionar si al tomar una determinación sobre el objeto de una demanda en el caso ante nuestra consideración, nos exponemos a contradecir una decisión anterior en cuanto al mismo objeto. Id., citando a A&P Gen. Contractors v. Asoc. Caná, 110 DPR 753, 764-765 (1981). Para ello, se tiene que identificar cuál es el bien jurídico cuya protección o concesión se solicita del juzgador. Considerándose no sólo la cosa sobre la cual se suscita la controversia, sino también el planteamiento jurídico que se genera en torno a ella. Presidential v. Transcaribe, *supra* a la pág. 274.

De otra parte, y en cuanto al requisito de identidad de causas, en Presidential v. Transcaribe, *supra*, el Tribunal Supremo citando a Scaevola, indica que la causa es el motivo que tuvo el demandante para pedir. Esta existe cuando los hechos y los fundamentos de las peticiones son idénticos en lo que afecta a la cuestión planteada. Así pues, al determinar si existe

identidad de causas de acción debemos preguntarnos si ambas reclamaciones se basan en la misma transacción o núcleo de hechos. Id.

*F.*

La Asamblea Legislativa tras evaluar la iniciativa del Gobierno Federal y a tenor del Real Estate Settlement Procedures Act, 12 U.S.C. 2601, et seq., (RESPA), adoptó en nuestra jurisdicción el programa de Mitigación de Pérdidas "Loss Mitigation", a través de la Ley de Ayuda al Deudor Hipotecario, Ley Núm. 169 de 9 de agosto de 2016, 32 LPRA sec. 2891, et seq., (en adelante Ley Núm. 169). Dicho estatuto fue creado a los fines de requerirle al acreedor de un préstamo en mora, que antes de iniciar cualquier proceso legal que pudiera culminar en una demanda de ejecución de hipoteca y cobro de dinero, le ofrezca al deudor hipotecario la alternativa de Mitigación de Pérdidas. Por consiguiente, tras la culminación de dicho proceso, y el deudor hipotecario conocer si cualifica o no para la aludida alternativa, entonces, el acreedor podrá comenzar un proceso legal ante los tribunales de Puerto Rico.

En relación con los procesos de mitigación de pérdidas, la sección 1024.41, "*Loss Mitigation Procedures*" dispone:

> (1) Complete loss mitigation application. A complete loss mitigation means an in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower. A servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application.

Una solicitud de mitigación de pérdidas completa significa que esta ha sido sometida con toda la información necesaria para que la institución financiera pueda evaluarla y explorar las alternativas disponibles para el deudor. Le corresponde a la institución financiera llevar a cabo las diligencias pertinentes para obtener los documentos y la información para así completar la solicitud de mitigación de pérdidas.

Por otra parte, en cuanto a la evaluación de la solicitud de "*los mitigation*", el inciso (c)(1) del mismo artículo estatuye lo siguiente:

(1) Complete loss mitigation application. Except as provided in paragraph (c)(4)(ii) of this section, if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application, a servicer shall:

(i) Evaluate the borrower for all loss mitigation options to the borrower; and

**(ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.** (Énfasis nuestro.)

Este inciso, en esencia, establece que una vez completada la solicitud de "*los mitigation*", se deben evaluar todas las opciones de "*los mitigation*", y proveerle al deudor una notificación escrita junto a la determinación de la institución financiera. Dicha notificación deberá incluir el periodo disponible para que el deudor acepte o rechace la oferta realizada por la institución financiera como parte del proceso de "*los mitigation*". De igual manera, deberá incluir el derecho del deudor para apelar en caso de que no esté de acuerdo con la decisión de la institución financiera.

En caso de que la solicitud del deudor sea denegada, el Reglamento X (Regulation X, CFR sec. 1024.1 to sec. Supplement I) también le impone a la institución financiera el deber de notificarle al deudor las razones específicas por las cuales fue denegada. 12 CFR sec. 1024.41(d). Por su parte, la sección 1024.41(g), explica que, nada limita a la institución financiera para que continúe con el procedimiento de ejecución de hipoteca, incluyendo publicaciones, arbitraje o requisitos de mediación establecidos por la ley aplicable cuando el primer aviso o presentación de un procedimiento de ejecución de hipoteca haya ocurrido antes de que la institución financiera

recibiera una solicitud completa de mitigación de pérdidas. Lo anterior procederá siempre y cuando estos no causen o resulten directamente en una sentencia de ejecución de hipoteca, una orden de venta o que se lleve a cabo una venta de ejecución hipotecaria en violación a la sección 1024.41.5.

**-III-**

Antes de explicar nuestra decisión, según nos ordena la normativa jurídica aplicable a las solicitudes de sentencia sumaria, hemos evaluado si la solicitud de sentencia sumaria sometida por Apex cumple con los requisitos de forma que exige la Regla 36 de Procedimiento Civil, *supra*. Efectuado el examen, concluimos que así fue. El escrito contiene una breve exposición de las alegaciones de las partes, identifica los asuntos litigiosos, la causa de acción sobre la cual solicita la sentencia sumaria, e incluye una relación concisa, organizada y en párrafos separados de aquellos hechos esenciales y pertinentes sobre los que proponen no existe controversia. Sobre esto último, también hace referencia a la evidencia admisible en la que descansa su propuesta. Asimismo, la moción de sentencia sumaria presentada expone las razones por las cuales la parte proponente entiende debe dictarse sentencia en virtud del derecho aplicable que incluye y el remedio que se solicita.

Similar avalúo realizamos sobre la oposición a la moción de sentencia sumaria presentada por el matrimonio Mayol-Zayas. El escrito contiene una breve exposición de las alegaciones de las partes, identifica los asuntos litigiosos y la causa de acción sobre la cual solicita la sentencia sumaria. Ahora, carece de indicación de párrafos, páginas de escritos o prueba admisible que justifique los hechos esenciales controvertidos y no controvertidos. Aun así, la ausencia no implica una concesión automática de una solicitud de sentencia sumaria puesto que la concesión de una solicitud de sentencia sumaria ocurrirá cuando en derecho así proceda.[10]

---

[10] Audiovisual Lang. v. Sist. Est. Natal Hnos., *supra*.

Concluido el avalúo de la sentencia sumaria y su oposición, entramos a evaluar los reclamos presentados en el caso de epígrafe a los fines de valorar si existen controversias de hechos medulares que impidan la resolución sumaria del pleito, así como para determinar si la aplicación del derecho efectuada por el foro primario fue correcta.

Mediante su primer señalamiento de error, el matrimonio Mayol-Zayas nos plantea que erró el foro primario al ordenar el pago de un pagaré a una entidad bancaria a favor de la cual no está endosado. Sostiene que el documento anejado por la parte apelada a la solicitud de sentencia sumaria no se trata de un endoso en blanco, toda vez que no cumple con las disposiciones de la Ley 208. Por esto, y demás razones, arguye que Apex no es tenedor de buena fe y carece de legitimación activa para llevar el caso de autos.

A los fines de atender este primer señalamiento de error, hemos examinado minuciosamente el expediente ante nuestra consideración, particularmente, la solicitud de sentencia sumaria de Apex y la oposición a la misma, que el matrimonio Mayol- Zayas presentó. En nuestro estudio, descubrimos que del legajo apelativo surge que en la *Moción de Sentencia Sumaria* que Apex presentó el 8 de febrero de 2024, entre otras cosas, alegó tener derecho sobre el instrumento negociable objeto de controversia por ser el tenedor del pagaré. Con el propósito de evidenciar su argumento, Apex anejó a su moción copia de un pagaré hipotecario junto con una declaración de certificación de deuda.

Al estudiar este documento vemos que, de la última página del pagaré surge lo siguiente: (1) una impresión de un sello de goma que contiene el nombre del endosatario en blanco, el nombre de Oriental y carece de firma y fecha; (2) una segunda impresión de un sello de goma "PAY TO THE ORDER OF: FHBNY without recourse EUROBANK" firmado y fechado; (3) una tercera impresión de un sello de goma "Pay to

the order of Oriental Bank and Trust" firmado y fechado; (4) una última impresión de un sello de goma con el nombre del endosatario en blanco y careciente de firma y fecha. A su vez, la declaración jurada, obtenida en el estado de Tennessee del 24 de mayo de 2023, describe el pagaré obtenido por los deudores, la hipoteca y la consecuente modificación de hipoteca. Declara que Apex es el tenedor del pagaré.

A simple vista, parecería que los apelantes tienen razón al cuestionar la legitimación activa de la parte apelada. El documento que Apex sometió para demostrar su legitimación activa contiene dos impresiones con un sello de goma que no constituyen un endoso eficaz y suficiente para transmitir el derecho reclamado.

En cuanto a este pliego específico, en su *Alegato en Oposición a Apelación* la parte apelada argumenta que el pagaré presentado en la Sentencia Sumaria, "contiene un endoso en blanco por lo que basta demostrar su posesión para establecer legitimidad". Falla en su argumento. No obstante, tomamos conocimiento judicial de la *Moción de Sustitución de Parte y Cesión de Interés* sometida ante el TPI el 30 de enero de 2020, en la que Oriental cede el pagaré hipotecario a la orden de Apex. Allí se aneja el instrumento negociable, debidamente endosado por Apex y en cumplimiento con la Ley 208. Ello quiere decir que, aun cuando el pagaré anejado a la *Moción de Sentencia Sumaria* no demuestra que Apex es el tenedor del pagaré, **el expediente judicial sí lo hace.**[11] Ciertamente, el primer error no fue cometido.

---

[11] Dada la fecha en la que inició el caso de epígrafe, su expediente no se encuentra entre aquellos presentados dentro del Sistema Universal de Manejo y Administración de Casos (SUMAC- TPI). Esto implica que los documentos ante nuestra consideración son aquellos específicamente provistos por los apelantes en su recurso o la parte apelada en su alegato. **Queremos creer, que los apelantes guardaron silencio en cuanto a la *Moción de Sustitución de Parte y Cesión de Interés* y el pagaré hipotecario a favor de Apex que se anejó a dicho escrito, por error involuntario**. Así pues, tomaremos sus reclamos de falta de legitimación activa como un ataque al documento en cuestión y no como una estrategia para inducirnos a error haciéndonos creer que la parte apelada en ningún momento evidenció la autoridad legal mediante la cual compareció en sustitución de Oriental.

Pasemos ahora a evaluar el segundo error señalado. Allí, y como segundo fundamento para declarar la nulidad de la sentencia dictada, los apelantes disponen que erró el foro inferior al denegar la aplicación del retracto litigioso. Para esto, reclaman la inaplicabilidad de la decisión alcanzada en DLJ Mortgage v. SLG Santiago-Ortiz, *supra,* empleada por el TPI al resolver, pues: es claro que Apex Bank no es tenedora del pagaré, está sujeta a toda defensa o contra reclamación que la parte demandada pueda oponer, es altamente cuestionable si la parte apelada procedió de buena fe y el pagaré no fue traspasado antes de su vencimiento. Asimismo, exponen que la mencionada jurisprudencia no aplica al caso de autos, ya que con posterioridad a esta decisión se aprobó el Código Civil de 2020, en el que, en lugar de suprimir el derecho de retracto de crédito litigioso, nuestra Asamblea Legislativa lo reforzó.

Apex, por su parte, en cuanto a este particular afirma que los apelantes están impedidos de levantar este señalamiento de error. Así, señala que los apelantes acudieron oportunamente durante el trámite del caso ante este Tribunal de Apelaciones mediante auto de *certiorari* precisamente de la negativa del TPI de aplicar la figura de retracto de crédito litigioso y que este foro se negó a expedirlo. Igualmente señala que, frente a esta decisión, los apelantes acudieron al Tribunal Supremo quien tomó similar acción. Basándose en esto, Apex reclama que la controversia en torno al crédito litigioso fue debidamente adjudicada y constituye la ley del caso.

Antes de atender los argumentos de los apelantes sobre este asunto, entendemos prudente señalar que el argumento traído por la parte apelada no es correcto. En nuestro ordenamiento jurídico es harto conocido que en el contexto de la adjudicación de peticiones de *certiorari* sobre asuntos interlocutorios, la denegatoria de un tribunal apelativo a expedir el auto no implica la ausencia de error en el dictamen cuya revisión se solicita, **ni**

**constituye una adjudicación en los méritos.** Por ende, en casos como ese no aplica la doctrina de la ley del caso.[12]

Dicho esto, resolvemos que el segundo error tampoco fue cometido. En primer lugar, y contrario a lo que argumentan los apelantes, arriba resolvimos que Apex sí es el tenedor de buena fe del pagaré hipotecario. Segundo, conforme surge del expediente, los apelantes notificaron su intención de extinguir el crédito litigioso fuera del tiempo proscrito en ley para que así lo hicieran.

Según se desprende de los hechos, el 30 de enero de 2020, los apelantes fueron notificados de la cesión del crédito a favor de Apex a través de la *Moción de Sustitución de Parte y Cesión de Interés*. Por tanto, y conforme el derecho vigente en ese momento, estos contaban con nueve (9) días para ejercer el derecho de retracto de crédito litigioso. Sin embargo, sometieron la moción para extinguir dicho crédito el 26 de febrero de 2020, veintiséis (26) días luego de la notificación de cesión. A ese momento el plazo de nueve (9) días para así hacerlo conforme el Código Civil de 1930, ya había expirado.[13]

Tercero, la figura del crédito litigioso es inaplicable al presente caso. Ello, debido a que el instrumento negociable se obtuvo mediante cesión al amparo de la Ley de Transacciones. Según señalamos anteriormente, Apex obtuvo el crédito a su favor por concesión del acreedor anterior, de buena fe y por valor recibido, antes de su vencimiento. Ciertamente, el foro sentenciador razonó correctamente al concluir este caso con lo resuelto en DLJ Mortgage v. SLG Santiago-Ortiz, *supra.* Por lo tanto, según ya adelantamos, el segundo error no se cometió.

---

[12] Véase, Cacho Pérez v. Hatton Gotay, 195 DPR 1 (2016).

[13] El Código Civil de 2020 establece que el deudor podrá invocar su derecho a extinguir el crédito litigioso dentro del término de caducidad de treinta (30) días desde que el cesionario reclama el pago. Sin embargo, al momento en que se le informó al TPI y a los apelantes sobre la cesión, este código no había sido aprobado.

Similar conclusión alcanzamos en cuanto al tercer señalamiento de error. Allí, los apelantes aducen que el foro primario incidió al desestimar su reconvención sin otorgarles la oportunidad de presentar prueba que sustente sus alegaciones y sin que hubiera concluido formalmente la etapa de descubrimiento de prueba. En este sentido, señalan que en el caso quedó pendiente de atenderse una moción mediante la cual se solicitó al foro primario que le ordenara a Apex producir ciertas tasaciones. El matrimonio Mayol-Zayas reclama que tal acto eliminó cualquier posibilidad de poder obtener prueba admisible y pertinente relacionada a las alegaciones de su reconvención y constituyó una limitación innecesaria al descubrimiento de prueba. Más aun, los apelantes argumentan que la desestimación de su reconvención sin permitir el desarrollo completo del descubrimiento de prueba falló en garantizarles el ejercicio pleno del debido proceso de ley por lo que el dictamen apelado debe ser revocado.

El alegato en oposición sometido por Apex, revela que lo alegado por los apelantes no es correcto. En la página 19 de su apelación, estos manifiestan que el 6 de febrero de 2024 acudieron al foro primario en búsqueda de una orden para compeler a Apex a descubrir unas tasaciones. También consignan que "[s]in embargo, dicha moción no fue atendida ni resuelta por el tribunal inferior, y pese a ello, el foro emitió sentencia sumaria, eliminando de manera anticipada la posibilidad de que esta parte completara la obtención de prueba pertinente y admisible." No obstante, la parte apelada incluyó en su apéndice la *Orden* emitida por el TPI con fecha del 8 de marzo de 2024, que se transcribe a continuación:

1. Moción de reconsideración: No Ha Lugar.

2. Moción en Solicitud de Orden para Compeler Contestaciones… No Ha Lugar, por tardía. El término para llevarse a cabo descubrimiento de prueba en el caso ya venció, sin solicitud opo[r]tuna de prórroga. (Énfasis nuestro)

Como puede apreciarse, y contrario a lo señalado por los apelantes, el foro primario sí atendió el escrito que en su momento sometieron sobre el descubrimiento de prueba.[14] La determinación emitida sobre el particular es parte de las decisiones que el foro primario dictó dentro del trámite del caso. La misma, está atada a la gran flexibilidad y discreción que se le reconoce a los jueces de primera instancia para lidiar con el diario manejo y tramitación de los asuntos judiciales ante su consideración. La conducción de estos asuntos está enmarcada en la razonabilidad. Ninguno de los argumentos levantados por los apelantes fue suficiente para encontrar que el foro primario abusó de su discreción al actuar de la manera en que lo hizo, por lo que no intervendremos.

De otra parte, en su cuarto señalamiento de error, el matrimonio Mayol-Zayas arguye que el foro primario erró al dictar sentencia sumaria sin antes celebrar un acto de mediación con el nuevo acreedor; o sea, Apex. No es correcto.

En primer lugar, tenemos presente que Apex compareció subrogándose en la misma posición de Oriental, el antiguo acreedor. Por consiguiente, se colocó en su misma posición jurídica y no se activó un proceso de mediación nuevo. Segundo, y más importante aún, es meritorio mencionar que en la *Sentencia* dictada en el caso por este Tribunal de Apelaciones el 21 de febrero de 2020, se determinó que la incomparecencia

---

[14] Al igual que hicimos en la nota al calce número 11, daremos el beneficio de la duda a la representación legal de los apelantes y supondremos que la manifestación hecha en su apelación en la que indican que el foro primario dictó la sentencia apelada sin atender su solicitud para compeler a descubrimiento de prueba es un malentendido en la redacción. Concluir lo contrario, sería entender que aprovechándose de que a diferencia de los casos presentados en SUMAC no tenemos acceso al expediente completo y con el propósito de inducirnos a error asevera que el foro primario dejó de hacer algo que claramente el propio expediente evidencia se hizo.

Le recordamos a los abogados que este tipo de conducta transgrede el Canon 35 de los Cánones de Ética Profesional, 4 LPRA Ap. IX, que impone a los abogados y a las abogadas el asegurarse de no proveer información falsa o incompatible con la verdad y de no ocultar información cierta que deba ser revelada. In re Joglar Castillo, 210 DPR 956 (2022). Por tal razón, estimamos prudente advertir a los abogados que este tipo de conducta no será aceptada en el futuro y que, de entenderlo necesario, en el futuro no titubearemos para referir este tipo de conducta a la evaluación del Tribunal Supremo de Puerto Rico.

de los apelantes a la vista de mediación constituyó razón suficiente para dar por concluido el proceso compulsorio de mediación. Al ser esta decisión una final y firme, al amparo del principio de cosa juzgada, estamos impedidos de reevaluarla.

Finalmente, en el último señalamiento de error, los apelantes le imputaron error al TPI por considerar cumplida la obligación del acreedor de ofrecer un proceso de mitigación de pérdidas conforme a la normativa federal aplicable. Sin embargo, el propio expediente derrota su contención. Como parte de la documentación que Apex sometió en apoyo de su *Moción de Sentencia Sumaria* se incluyeron tres (3) cartas para evidenciar las evaluaciones realizadas como parte del proceso de "*loss mitigation*" y su denegatoria. Los apelantes aceptan que estas misivas fueron remitidas.

La primera de estas cartas establece que luego de evaluado el caso para una modificación de hipoteca, se denegó la misma por no obtenerse un plan de reestructuración razonable y debido a que Apex no participa en programas de gobiernos. La segunda carta, deniega la opción de "*short sale*" puesto que la cantidad ofertada fue de $250,000 cuando la deuda al momento era de $1,568,889.76, mientras que la tercera de estas estipula que se ofreció un "*short pay-off*", pero se denegó por los mismos argumentos que la anterior. Estas misivas demuestran que Apex realizó el proceso de mitigación conforme a la ley federal aplicable.

En la discusión del derecho aplicable arriba expuesto, esbozamos que conforme a las Reglas de Procedimiento Civil el tribunal puede dictar sentencia sumaria cuando no existan hechos materiales esenciales en controversia. También expusimos que corresponde al peticionario la carga de demostrar, mediante prueba fehaciente, la inexistencia de hechos controvertidos.

En el caso de autos, la parte apelada demostró mediante prueba fehaciente demostrativa que no existía controversia sobre hechos materiales

esenciales. Habida cuenta de ello, y en virtud de todo lo que hasta aquí hemos consignado, resolvemos que en el presente caso no existía impedimento alguno en derecho para conceder la moción de sentencia sumaria de la parte apelada y resolver el pleito sumariamente a su favor. Por ello, confirmamos la sentencia apelada.

**-IV-**

Por los fundamentos antes expuestos, confirmamos la sentencia apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones